Carol McCREADY, individually and on behalf of all others similarly situated, Appellant,

v.

BLUE SHIELD OF VIRGINIA; Blue Shield of Southwestern Virginia; Neuropsychiatric Society of Virginia, Inc., Appellees,

and

Medical Service of the District of Columbia, Inc., Defendant.

No. 78–1883.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 4, 1979.

Decided May 12, 1981.

Rehearing and Rehearing En Banc Denied July 2, 1981.*

---

* WIDENER, Circuit Judge dissents.

Before BUTZNER and WIDENER, Circuit Judges, and THOMSEN, Senior District Judge.*

THOMSEN, Senior District Judge:

Carol McCready brought this action in the United States District Court for the Eastern District of Virginia, claiming that defendants Blue Shield of Virginia, Blue Shield of Southwestern Virginia, Medical Services of the District of Columbia (collectively, Blue Shield) and the Neuropsychiatric Society of Virginia participated in an unlawful combination and conspiracy to exclude clinical psychologists from receiving compensation under Blue Shield's prepaid health care plans in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1[1] and Section 4 of the Clayton Act, 15 U.S.C. § 15.[2] McCready brought the case as a class action on behalf of all Blue Shield subscribers in Virginia who incurred costs for psychological services since 1973 but who were not reimbursed for those costs under the applicable health care plans of Blue Shield. She sought treble damages and attorney's fees as provided by the antitrust laws. The district court dismissed her complaint on the grounds that McCready had no standing to bring such an action and had suffered no antitrust injury because her injury was not suffered within the sector of the economy endangered by defendants' alleged violations of the antitrust laws.[3]

\*    \*    \*    \*    \*    \*

From September 1975 until January 1978, McCready, an employee of Prince William County, Virginia, was a subscriber to one of

Timothy J. Bloomfield, Washington, D. C. (Alan J. Kriegel, Dunnells, Duvall, Bennett & Porter, Warwick R. Furr, II, Lewis, Mitchell & Moore, Washington, D. C., on brief), for appellant.

R. Gordon Smith, Richmond, Va. (James H. Walsh, McGuire, Woods & Battle, Richmond, Va., Ronald M. Ayers, Heman A. Marshall, III, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., Joel I. Klein, Eugene J. Comey, Rogovin, Stern & Huge, Washington, D. C., Fràncis J. Prior, Jr., Siciliano, Ellis, Sheridan & Dyer, Arlington, Va., on brief), for appellees.

---

\* United States District Court for the District of Maryland, sitting by designation.

1. § 1 of the Sherman Act provides in part:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal:
   . . . .

2. § 4 of the Clayton Act provides:
   Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in the district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

3. McCready also sought relief through the court's pendant jurisdiction, on a breach of contract claim. The dismissal of the pendant claim is not before us on appeal.

the health care plans administered by Blue Shield. The county provided its employees group coverage purchased from Blue Shield of Virginia. That group plan provided for reimbursement to subscribers for treatment by psychiatrists, or by psychologists whose services were supervised and billed by a treating physician. No reimbursement was allowed for treatment by psychologists unless billed through a treating physician.

During the period of her health care coverage through Blue Shield, McCready received treatment from a clinical psychologist. She unsuccessfully sought reimbursement of those bills from Blue Shield.[4] In 1978, she brought this action, claiming a conspiracy by defendants to boycott psychologists, which she alleged was effectuated by Blue Shield's refusal to reimburse its subscribers for costs of psychological services because those services were rendered and billed by a psychologist and not by a physician.

The alleged conspirators are the Blue Shield defendants, listed above (all of which are separate non-stock corporations engaged in the business of health care plans), Neuropsychiatric Society of Virginia, a not-for-profit nonstock corporation whose members are psychiatrists practicing in Virginia, and other unnamed co-conspirators. By agreement among themselves, it was alleged, those parties sought to exclude psychologists from reimbursement coverage under Blue Shield's contracts in the State of Virginia.

A related action was filed in the same district court by the Virginia Academy of Clinical Psychologists (VACP), and the two cases were consolidated for pretrial discovery purposes. Motions to dismiss were filed by the defendants in each case and were heard together.

The district court granted the motion to dismiss the case now before us on appeal, but denied the motion to dismiss the VACP case.

In its opinion granting defendants' motion to dismiss the instant case, the district court concluded that "the section of the economy *competitively* endangered by a violation by the defendants goes no further than that area occupied by the psychologists." (Emphasis in original) Therefore, it reasoned, McCready was "operating in a market" which was "*unrestrained insofar as she is concerned;*" and her injury was "too indirect and remote" to be an antitrust injury. The district court also stated that "[w]hile standing and antitrust injury may or may not be treated as the same issue, in this case Jane Doe [McCready] [5] does not have the former because she has not sustained the latter." As a result, the district court dismissed McCready's complaint because of lack of standing to sue.

The VACP case went to trial on the merits and resulted in a judgment for defendants. *Virginia Academy, etc. v. Blue Shield of Virginia*, 469 F.Supp. 552 (E.D.Va.1979). That judgment was affirmed in part, vacated and remanded in part, by another panel of this court, 4 Cir., 624 F.2d 476 (1980), which should be read in connection with this opinion, although it did not deal with all the issues presented by this appeal.

McCready contends that she not only has suffered a property injury within the meaning of the antitrust laws but that her injuries were suffered by reason of the antitrust violations alleged. Since McCready appeals the granting of defendants' motion to dismiss, we take as true all facts well pleaded in her complaint.

\*     \*     \*     \*     \*     \*

The Clayton Act provides that an antitrust plaintiff must have been injured in his "business or property," and further, that such injury must result by reason of something "forbidden in the antitrust laws."

McCready's contention, that consumers who have suffered non-commercial mone-

---

4. McCready was mistakenly paid $128.00 by Blue Shield after submission of claims for psychological services. Once the error was discovered, Blue Shield sought to obtain a refund from McCready of that amount.

5. McCready brought this action under the pseudonym "Jane Doe," but the district judge required her to disclose her true name.

tary injury as a result of an antitrust violation have been injured in their property within the meaning of the Clayton Act, was decided favorably to her position by the Supreme Court in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), after the district court had entered its order. The district court, however, did not rely on the fact that her claimed injury was non-commercial in dismissing the complaint.

The plaintiff in *Sonotone* was a consumer who alleged that as a result of antitrust violations, including horizontal and vertical price-fixing, she was forced to pay an artificially high price for a hearing aid. She brought a class action against the hearing aid manufacturers. The district court certified for interlocutory review the issue of consumer standing. In reversing the decision of the Court of Appeals denying such standing, the Supreme Court held that "[a] consumer whose money has been diminished by reason of an antitrust violation has been injured 'in his ... property' within the meaning of § 4 [of the Clayton Act]". Id. at 339, 99 S.Ct. at 2331. Therefore, Reiter's allegation of financial loss because she paid a higher price as a result of Sonotone's anti-competitive conduct was sufficient to make out an injury to her "property" within the meaning of § 4 of the Clayton Act.

McCready can no longer be denied standing simply because she is a consumer with a non-commercial monetary loss. *Sonotone*, however, is not dispositive of all of the issues here. The consumer still must prove that her injury resulted from an antitrust violation.

Although the ultimate goal of the conspiracy alleged by plaintiff was the exclusion of clinical psychologists from a large segment of the market, the direct victims of the conspirators include McCready and the class of similarly situated patients whom she seeks to represent, as well as the clinical psychologists; both were in the target area. The complaint alleges that the conspirators exclude psychologists by making it too expensive for Blue Shield subscribers to consult them. This is accomplished by Blue Shield's refusal to reimburse a subscriber for the services of a psychologist unless the patient also consulted a physician. In contrast, Blue Shield would reimburse a subscriber who received similar treatment from a psychiatrist without further consultation. McCready alleges that as a result of the conspiracy, Blue Shield denied her reimbursement for sums she paid for treatment when she consulted a psychologist instead of a psychiatrist.

Section 4 of the Clayton Act affords relief to "[a]ny person ... injured in his ... property by reason of anything forbidden in the antitrust laws ...." By its terms the Act does not restrict standing to competitors who are the targets of anticompetitive behavior. *Sonotone*, supra. It encompasses "any person" whose property loss is directly or proximately caused by violation of the law. See *South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414, 417 (4 Cir. 1966). McCready satisfies these requirements. Her injury was immediate and direct. Although denial of reimbursement was designed to divert her and other subscribers from psychologists to psychiatrists, this goal does not make her loss too remote or indirect to be covered by the Act.

Use of the catch words "target area" is convenient to deny standing, but it can be justified only when the underlying purposes of the phrase are served. It is generally recognized that the target area test for denial of standing serves two purposes. First, it bars suits by persons whose damages are speculative and difficult to prove. See *Calderone Enterprises Corp. v. United Artists Theatre Circuit*, 454 F.2d 1292, 1295 (2 Cir. 1971). This reason for denying standing does not apply to McCready. Her damages can be readily ascertained to the penny; they are her reimbursable costs of treatment. These are fixed by her Blue Shield contract as 80% of the amount she paid the psychologist.

The second purpose of the target area is the prevention of multiple recoveries by different plaintiffs against the same defendants for a single injury. *Ames v. American Telephone & Telegraph Co.*, 166

F. 820, 823 (C.C.D.Mass.1909). The second reason for denying standing also does not apply to McCready. There can be no double recovery. She has already paid her psychologist's bills; the psychologist suffered no damage in this respect. Although McCready is a consumer and not a competitor, her allegations of direct pecuniary loss by reason of antitrust violations are sufficient to confer standing. *Sonotone*, supra; *South Carolina Council of Milk Producers*, supra.

\* \* \* \* \* \*

The judgment of the district court is reversed and the case is remanded for further proceedings to determine the propriety of certifying the class and the merits of plaintiff's claim as alleged in her complaint.

REVERSED AND REMANDED WITH INSTRUCTIONS.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

### I

My first point of dissent with the majority is upon its construction and application, or non-application strictly speaking, of the target area rule.

The majority proceeds upon an erroneous factual premise and then follows up that error. The erroneous premise is found on page —— of its opinion, and is as follows:
"Although denial of reimbursement was designed to divert her [Miss McCready] and other subscribers from psychologists to psychiatrists, this goal does not make her loss too remote or indirect to be covered by the Act."
The difficulty with the statement is that Miss McCready did not plead or otherwise show that any alleged conspiracy was either "designed to divert her" from a psychologist to a psychiatrist, or that any such "goal" existed. The nearest thing in her pleadings to the factual premise relied upon by the majority is that "as a further consequence of the acts and practices described hereinabove: . . . patients have been economically coerced to receive psychological

services from psychiatrists rather than clinical psychologists. . . ." Thus, even the plaintiff does not describe her injury as a design or goal of any antitrust violation, rather as a consequence thereof.

It is just such a difference that the target area rule applies to.

While referring to our case of *South Carolina Council of Milk Producers v. Newton*, p. 417, as support for the proposition that any person whose property loss is directly or proximately caused by violation of law has standing to sue, the majority neglects to give any effect to *Newton*, p. 419, that if the injury to the plaintiff is only incidental or consequential, or if the plaintiff is so removed from the defendants' acts that his injury is only remotely caused by defendants' antitrust actions, then the plaintiff is not injured by reason of anything forbidden in the antitrust laws. It is this restriction on coverage which was not altered by *Sonotone*, I submit, and my conclusion is verified by the other circuits which have considered the matter since that case.

As just stated, we have spoken to the issue of injury by reason of an antitrust violation in *South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414 (4 Cir. 1966). There a group of milk producers brought an action under the antitrust laws against wholesale and retail grocers, alleging that their conspiracy to sell milk at unreasonably low prices resulted in an unlawful diversion of the milk trade to the defendants, with a resulting threatening of the economic existence of the milk industry in South Carolina. The district court granted summary judgment for the defendants on the ground that there was no privity of contract or direct competition to result in a direct injury actionable under the antitrust laws.

This court reversed, holding that § 4 does not limit relief to persons with a direct contractual or competitive relationship with those charged with an antitrust violation. A cause of action under § 4 of the Clayton Act, we held, is not dependent upon a contractual or competitive relationship between the parties. All a plaintiff must

show to have standing to sue under § 4 is that he is "within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby...." *Newton* at 418. The court cautioned, however, that if the injury to the plaintiff is only incidental or consequential or if the plaintiff is so removed from the defendant's acts that his injury is only remotely caused by defendant's antitrust actions, then the plaintiff is not injured by reason of anything forbidden in the antitrust laws.

This is what is called the "target area" test which has been followed by a number of circuits,[1] as well as our own, and which I think cannot be explained away largely by a description of the rule as "catch words." It was thoroughly discussed by the Ninth Circuit in *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358 (1955), relied upon by this court in *Newton*. There a manufacturer of car wax was allowed to sue Richfield Oil, a producer of petroleum products, which had entered into agreements with independent service station operators who sold Richfield Oil products for the exclusive selling of certain auto accessories, including car wax, sponsored by, but not made by, Richfield. Those sponsored accessories did not include Karseal's products. The court held that the right to sue was not limited to those independent distributors of Karseal's wax. In determining who has standing to sue, the courts must look at who the illegal act was aimed to injure. A bystander, who is not the intended victim of the antitrust violation but who is injured nonetheless, cannot sue under the antitrust laws. His injury is too remote.

In other words, it is not enough that a plaintiff show that one purpose of the defendant's act was a restraint of trade and that the act committed caused injury to the plaintiff. He must go further and show that he was within the sector of the economy endangered by the breakdown in competition in order to satisfy the "by reason of" requirement. *Karseal* at 363.

Miss McCready alleges that the district court erred by incorrectly applying the target area standard of *Newton*, as reflected in its conclusion that "the sector of the economy *competitively* endangered by a violation of the defendants goes no further than that area occupied by the psychologists." She quarrels with the district court's use of the word "competitively" as being contrary to the holding of *Newton*, where we noted that direct competition is not a prerequisite for standing. Although it may not be completely clear, I do not read the language of the district court to require direct competition between the parties. All the district court said was that the target of the Blue Shield defendants' actions was the psychologists and not the subscribers of Blue Shield plans. The district court did not use the word as a *sine qua non* of its decision but merely as descriptive of the way one sector of the economy was endangered by the defendants. The fact that Miss McCready was not in the threatened sector, the district court properly considered as supporting its conclusion to dismiss the complaint.

I would hold that plaintiff does not satisfy the requirement of § 4 that she be in-

---

1. The target area test has been followed by the Second Circuit in *Calderone Enterprises Corp. v. United Artists Theatre Circuit*, 454 F.2d 1292 (1971), cert. den. 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972), and many other cases. It has as well been followed by the cases mentioned in this opinion and still other cases which I do not attempt to list.

The Second Circuit describes the target area rule as follows in *Calderone*, at p. 1295, and, while remembering that it should be applied on a case by case basis, I think the rule as applied in the Second Circuit should be followed:

"In a series of decisions over the last 15 years, in all of which certiorari was denied by the Supreme Court, this court has committed itself to the principle that in order to have 'standing' to sue for treble damages under § 4 of the Clayton Act, a person must be within the 'target area' of the alleged antitrust conspiracy, i. e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued. Accordingly we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with 'targets' or with participants in an alleged antitrust conspiracy, rather than by being 'targets' themselves...."

jured "by reason of" a violation of the antitrust laws. She does not claim that the actions of the Blue Shield defendants were aimed at injuring any group beyond the psychologists. The psychologists make up the group within the sector of the economy in which the illegal conduct of the Blue Shield defendants threatens to break down competitive conditions. Any injury to Miss McCready is too indirect and consequential to be actionable under § 4 of the Clayton Act. As the district court said, she operated in a market which was unrestrained so far as she was concerned.

My conclusion that the district court was correct in denying recovery is fortified, I think, by the reasoning of the Court in *Sonotone*, as well as by its acknowledgment in *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262, n. 14, 92 S.Ct. 885, 891, n.14, 31 L.Ed.2d 184 (1972), that "[t]he lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy for damages for all injuries that might be conceivably traced to an antitrust violation." In *Sonotone*, while holding that a consumer who purchased goods at an artificially high price caused by antitrust violations was injured in his property, the Court recognized that "[t]he phrase 'business or property' also retains restrictive significance," giving as an example personal injuries. It continued that "Congress must have intended to exclude some class of injuries by the phrase 'business or property'". I thus think it is beyond argument that injury to business or property under § 4 has a restrictive meaning. The question before us is whether the plaintiff brings herself within the terms of the statute as construed by the applicable cases.

While no case is found subsequent to the decision in *Sonotone* on the same facts as those presented here, all three Circuits which have considered the matter since that time have adhered to their earlier rulings giving restrictive significance to the requirement of § 4 of the Clayton Act, that, in order to recover, an antitrust plaintiff must have been injured in his business or property by something forbidden in the antitrust laws.

The first of those cases was *In re: Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979) (a multidistrict case). There, the plaintiffs were producers of fat cattle. They alleged that 25 retail food chains and others, by agreeing to purchase only at artificially low prices from slaughterhouses and packers, caused these low prices to be passed up the chain of distribution which reduced the prices the plaintiffs received in selling their cattle to the packers and slaughterhouses. Some of the plaintiffs alleged that they had purchased beef at retail as consumers at prices artificially high because of a retail price fixing conspiracy by the same defendants. The other plaintiffs did not so allege, however. Those who did not allege that they had purchased beef from the defendants maintained that the retail price fixing conspiracy reduced consumer demand for beef, thus derivatively reducing the retailers' and the packers' demand for their fat cattle. Their claim, then, was that they were injured by the retail price fixing conspiracy just as much as if they had bought beef. Relying on *Sonotone*, the court reversed the district court's striking the allegations of retail price fixing from the complaints of those plaintiffs who had purchased beef at retail. It sustained, however, the striking of the retail price fixing allegations from the complaints of the plaintiffs who had not purchased beef at retail. The court held squarely that those plaintiffs who had not purchased at retail did not have standing to sue for such remote injury, and that they were not within the target area of the retail antitrust conspiracy. The court held that the target of a retail price fixing conspiracy was the retail purchaser, and reasoned that recognizing the non-purchasing plaintiffs as targets of the retail price fixing conspiracy would be to grant antitrust standing to firms and persons at every level of beef production and distribution, quoting note 14 in *Hawaii v. Standard Oil* as I have above.

The next case following *Sonotone* was *Sherman v. British Leyland Motors Ltd.*,

601 F.2d 429 (9th Cir. 1979). Sherman was the owner of a corporation which had alleged a valid claim against British Leyland and others under the antitrust laws. His corporation had been forced to go out of business because its Triumph distributorship franchise had been canceled as a result of antitrust violations by the defendants. Although Sherman was injured in fact, and that was accepted, the court held that Sherman had no standing to sue in his individual capacity as a shareholder or as a creditor of his corporation because the loss was indirect. Id. at pp. 439, 440.

The last decision of a court of appeals since Sonotone is Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1 (1st Cir. 1979). ESI had a contract with Agrati, an Italian firm, as Agrati's sole distributor in North America for Agrati minicycles. Bombardier wanted that distributorship, interfered with ESI's contractual relationship with Agrati, and agreed with Agrati to divide the market. The claim against Bombardier for interference with contractual relations aside, the court held that ESI had a valid claim under the Sherman Act against Bombardier for agreeing with Agrati to divide the market because the agreement necessarily required the extinction of ESI as North American distributor. Two of ESI's sub-distributors were Durham and Watercraft. ESI's demise as the Agrati distributor necessarily resulted in their inability to obtain the Agrati product and in financial loss to them in having to compete with the product and in a consequential loss of sales. Actual injury to them was acknowledged by the court. The court held, however, that neither Durham nor Watercraft had standing to sue under § 4 of the Clayton Act because they lay outside the target area of the conspiracy. The court found that the conspiracy between Bombardier and Agrati to divide markets was not aimed at the market level to which Durham and Watercraft were operating, that the anticompetitive acts taken against ESI were directed solely at ESI as a part of the scheme to divide territories, and that Durham and Watercraft were not the principal victims of the conspiracy but were innocent bystanders who were hit but not aimed at. The court said that "[a]lthough the natural result of depriving ESI of the Agrati product was to likewise deprive ESI's distributors of it, we think the distributors lie outside the target area section 4 encompasses." 605 F.2d at 18. As did Sherman and Beef Industries, the court here considered the effect of Sonotone and nevertheless found that the plaintiffs did not have standing.

While two of the three cases[2] just discussed have no retail consumer as a plaintiff, each of the three stand for the proposition that the antitrust plaintiff must have been in the target area encompassed by the anticompetitive actions of the defendant or else recovery is not permitted.

I am of opinion the injury to McCready, that she is not eligible for reimbursement under her contract with Blue Shield, is too indirect and consequential for her to prosecute that claim under § 4 of the Clayton Act. She is not in the target area, that being in this case the psychologists. The price of psychologists' services to her was not increased by any act of the defendants. The fact that her Blue Shield contract, which was in the nature of insurance, would not reimburse her for those services had nothing to do with the price she paid for the services, which indeed were not artificially inflated by an antitrust violation. The area in which she operated was entirely unrestrained. I think McCready's claim falls squarely within the reasoning of Sherman, ESI, and Beef Industries.

The fact that Miss McCready's status as a consumer does not, under Sonotone, necessarily preclude her suit for lack of standing, does not mean that she necessarily has standing to sue as an antitrust plaintiff in this case, for, as the cases demonstrate, an antitrust plaintiff may have suffered actual

injury but not be within the target area of the antitrust violation. If whether or not she was in the target area were questionable and subject to proof, then I would be inclined to hold that she had standing, and, if her claim should be dismissed, to require the dismissal of the claim for failure to state a claim upon which relief may be granted. *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Osborn v. Bank of United States*, 9 Wheat 738, 22 U.S. 738, 6 L.Ed. 204 (1824). For, as *Bell* and *Osborn* hold, when the jurisdiction of the court and the cause of action depend on the same fact, the court should assert its jurisdiction, and, if the case should be dismissed, dismiss it for failure to state a cause of action. She, however, has left no room for proof. Her only injury is that she has been unable to receive reimbursement for her psychologists' bills. There is not even a claim that her psychologists' bills are higher than they would have been had the conspiracy not existed. It is true that standing is a jurisdictional question. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 260, 97 S.Ct. 555, 560, 50 L.Ed.2d 450 (1977), but the facts as stated by the plaintiff show that she has no standing because they show that she is not within the target area of the antitrust violation. Thus, dismissal of her case for that reason was proper. It is not necessary to remand for dismissal for failure to state a claim under *Bell* and *Osborn*.

While the standing issue in antitrust actions is a complex one and while I am warned that dismissal of antitrust claims on motions should be used "sparingly," *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), I do not believe the district court erred in dismissing the complaint on motion. The plaintiff simply has not stated a claim to standing under § 4 of the Clayton Act. The plaintiff in *Sonotone* was a retail purchaser, and the violations charged included "vertical and horizontal price fixing." *Sonotone*, 442 U.S. p. 335, 99 S.Ct. p. 2329. While the plaintiff here might be considered a retail purchaser of services, there not only is no allegation of price fixing, there is no claim

or allusion to it. The plaintiff has not placed herself within the protection of *Sonotone*.

## II

A separate and more general ground for my disagreement with the result obtained by the majority is a proposition which has not been discussed in the allied case of *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, et al.*, 624 F.2d 476 (4th Cir. 1980), in the opinion of the district court, or in the opinion of the majority, although it looms so large in the background it should not be ignored. It is essentially that a group of subscribers has a perfect right to contract with some providers of medical services, as used in the broad sense, without contracting with all of them, under pain of conviction under the antitrust laws.

In general terms, physicians are a dedicated lot. By education, training, and inclination, they devote their adult lives to the physical care of others. While the same measure of devotion may be claimed, or even obtained, by other providers, the same level of skill is not. Physicians are recognized, certainly by the Commonwealth of Virginia, and I suppose by every State, by the issuance of licenses to practice medicine, a recognition not accorded to any other provider of medical services. To say that the subscribers to Blue Cross-Blue Shield may not contract with psychiatrists, who are physicians, for their services, without having a court compel a contract with psychologists, who are not physicians, to me is straining the antitrust laws beyond any imagined coverage that they might have.

Without necessarily equating the services of psychologists with those of psychiatrists, the result obtained by the majority is without support. I submit nothing in the record supports such an equation.

If a group of people (the subscribers) wish to contract at lower premiums for one medical service (physicians) without contracting with another (psychologists), I think they have a perfect right so to do, and

if they wish to place special trust in the physicians to approve any other allied medical service, I think they have a perfect right to do that also. The antitrust laws simply are not intended to cover the fact situation at hand.

I would affirm.